UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

JAMES J. BINNS,

                    Plaintiff,             02 Civ. 7884 (JGK)
                                                 03 Civ. 9199 (JGK)

        - against -

JOHN R. HALLE; CNB SPORTS AND
ENTERTAINMENT; FILM REALTY FUNDING CO.,
LLC; CNB CAPITAL, INC.; TIMOTHY D.
FITZPATRICK; FITZPATRICK CONSTRUCTION
CANADA LTD; PARTECH, INC.; RICHARD
MILANO; GREGORY RICCA; JAGUAR
INVESTMENTS, INC.; R&M CAPITAL PARTNERS,
INC.; and JOHN DOES 1-10,

                    Defendants.
————————————————————————————————

RICHARD DAVIMOS, JR. and LAURENCE ZALK,

                    Plaintiffs,

        - against -

JOHN R. HALLE; CNB SPORTS AND
ENTERTAINMENT; FILM REALTY FUNDING CO.,
LLC; CNB CAPITAL, INC.; GREGORY RICCA;
JAGUAR INVESTMENTS; and JOHN DOES 1-10,

                    Defendants.
————————————————————————————————

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

**JOHN G. KOELTL, District Judge:**

The plaintiffs James J. Binns, Richard Davimos, Jr., and Lawrence Zalk sued the defendant John R. Hallé and various entities in two separate complaints that were consolidated for trial. All defendants other than Hallé were dismissed prior to trial on consent of the remaining parties. Various claims against Hallé were also dismissed prior to trial on consent of the remaining parties. On May 15 and May 16, 2006, this Court held a non-jury trial on the plaintiffs' remaining claims against Hallé, namely, breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of fiduciary duty, conversion, rescission, unjust enrichment, constructive trust, and punitive damages. Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law.

## FINDINGS OF FACT

### A.    THE PARTIES

1. James J. Binns ("Binns") is a citizen of Pennsylvania.

2. Richard Davimos, Jr., ("Davimos") is a citizen of New Jersey.

3. Laurence Zalk ("Zalk") is a citizen of New Jersey.

4.    John R. Hallé ("Hallé") is a citizen of New Hampshire.

### B.    **FACTS**

5.    In July 2000, Fitzpatrick Construction, Ltd.
      ("Fitzpatrick"), a Québec corporation with its principal
      place of business in Montréal, Québec, Canada, was the
      owner of 100% of the stock of Société Immobilière
      Parctech, Inc. ("Parctech"), a Québec corporation.

6.    In July 2000 Parctech owned a 210,000 square foot parcel
      of land in Montréal, Québec, Canada, and an option to
      purchase additional land from the City of Montréal
      (collectively the "Parctech land").

7.    In July 2000 John Hallé was the owner of 100% of the
      shares of CNB Capital, Inc. ("CNB Capital").

8.    In July 2000 CNB Capital owned 100% of the stock of CNB
      Sports and Entertainment, LLC ("CNBE").

9.    Davimos, who had known Hallé since 1998, discussed with
      Hallé a business venture involving the construction of a
      movie studio on the Parctech land.  Prior to the
      transaction at issue in this case, Davimos and Hallé had
      been involved in 6 or 7 projects and were personal
      friends.  Davimos was deeply involved in the project and
      went to Montréal to inspect the property.

10.  A new entity named Film Realty, LLC ("Film Realty") was to be formed for the purpose of acquiring the shares of Parctech from Fitzpatrick and developing the movie studio on the Parctech land.

11.  Film Realty was to offer twenty subscriptions to selected investors at a price of $100,000 per subscription.

12.  Davimos expressed interest in investing in Film Realty.

13.  Zalk, a friend of Davimos's who also knew Hallé well, expressed interest in investing in Film Realty.

14.  Zalk testified that he relied on his trust in Hallé, but not on any specific representation by Hallé, in deciding to invest in Film Realty.

15.  Binns was introduced to Hallé by Davimos and also expressed interest in investing in Film Realty.

16.  Binns testified that, in deciding to invest in Film Realty, he relied upon a representation by Hallé that Film Realty already owned the Parctech land.  This allegation is not credible, particularly in view of the allegation in Binns's complaint in this action, filed much closer in time to the investment, that Hallé represented that "CNB Sports and Entertainment, Film Realty Funding CO, Ltd., and CNB Capital, Inc. were the

owners in fee simple of valuable real estate in Vancouver, Canada." (Complaint ¶ 22.)

17. Binns also testified that he relied upon a false representation by Hallé that his subscription was the last of twenty available to be sold. However, Binns's complaint in this action, filed much closer in time to the time of the investment, makes no reference to this alleged false representation and the Court cannot credit this testimony.

18. Hallé retained the law firm of Rudolph & Beer, L.L.P., to prepare a Confidential Private Placement Memomorandum (the "PPM") and a Subscription Agreement for Film Realty. (Pls.' Ex. 1 (PPM); Pls. Ex. 6 (Subscription Agreement).)

19. The PPM provided that CNBE, a company owned by Hallé, would serve as the manager of Film Realty. (PPM at 1, 4.)

20. The PPM stated that Film Realty had "been formed for the purpose of acquiring 100% of the outstanding shares of Parctech...." (PPM at 9.) The PPM also provided that the use of the proceeds of the $2,000,000 private placement was to "provide financing for the acquisition of land in Montréal for the development of a film production studio...." (PPM at 2.)

21. The PPM also stated somewhat inconsistently that Film
    Realty had already "closed on the individual parcel of
    the land acquisition, and has hired various consultants
    to efficiently develop the property."  (PPM at 9.)

22. This statement was not accurate.  At the time Binns,
    Davimos, and Zalk signed the PPM in July 2000, Film
    Realty had not yet been incorporated.

23. Rather, on July 7, 2000, Hallé, on behalf of CNB
    Capital, had entered into a contract with Fitzpatrick to
    purchase 90% of the shares of Parctech and an option to
    purchase the remaining 10% of Parctech shares.  Parctech
    was to remain the owner of record for the parcel of land
    itself.  (Pls.' Ex. 2.)  Hallé entered into the contract
    on behalf of CNB Capital because Film Realty had not yet
    been formed.

24. The purchase price for 90% of Parctech shares and the
    option to purchase the remaining 10% of Parctech shares
    was $420,000 CDN, which was the equivalent of
    approximately $292,852.74 US.

25. Binns, Davimos, and Zalk each signed the Subscription
    Agreement for Film Realty.  (Pls.' Ex. 6; Def.'s Ex. M.)
    The Subscription Agreement expressly provided that
    "[t]here is no provision for the return or escrow of
    subscriptions if all offered units are not sold."

(Pls.' Ex. 6 at 2.)  The Subscription Agreement also provided that "the Investor has not been furnished with nor relied upon any representations or other information (whether oral or written) from [Film Realty], other than as set forth in the [PPM]."  (Id.)

26.  By signing the Subscription Agreement, each of the plaintiffs represented and covenanted that he "ha[d] been furnished with, and ha[d] carefully read, the [PPM], this Subscription Agreement, and any documents that have been made available to the Investor upon request (to the extent the Investor deemed necessary or appropriate)."  (Pls.' Ex. 6 at 2.)

27.  Binns, Davimos, and Zalk had not, at the time they signed the Subscription Agreement, read the PPM.

28.  According to the PPM, investors in Film Realty were to sign the LLC Operating Agreement and the Subscription Agreement, and deliver a check or money order payable to "Film Realty, LLC," in the amount of the investment in order to subscribe. (Pls.' Ex. 1 at 15.)

29.  At Hallé's direction, rather than delivering a check or money order payable to "Film Realty, LLC" as specified in the PPM, Davimos deposited $100,000 in a bank account held by CNB on July 24, 2000, for the purpose of investing in Film Realty.

30.  At Hallé's direction, rather than delivering a check or money order payable to "Film Realty, LLC" as specified in the PPM, Zalk deposited $100,000 in a bank account held by CNB Capital on July 25, 2000, for the purpose of investing in Film Realty.

31.  At the direction of Hallé's assistant, who in turn had been directed by Hallé, rather than delivering a check or money order payable to "Film Realty, LLC" as specified in the PPM, Binns deposited $100,000 in a bank account held by CNB Capital on August 1, 2000, for the purpose of investing in Film Realty.  Each of the plaintiffs knew that their investments were being given initially to CNB Capital.

32.  Film Realty was incorporated under the laws of the state of Delaware on August 3, 2000.  (Pls.' Ex. 7.)

33.  A fourth investor, Jeffrey Hoffman ("Hoffman"), also invested $100,000 in Film Realty.

34.  There were no investors in Film Realty other than Davimos, Zalk, Binns, and Hoffman.

35.  The total amount invested in Film Realty was $400,000.

36.  On July 11, 2000, CNB Capital made a payment of $7,000 US to Fitzpatrick pursuant to the July 7, 2000 agreement to purchase 90 common shares of Parctech. (Pls.' Ex. 3; Def.'s Ex. D.)

37.  On July 19, 2000, CNB Capital made a payment of $7,000
     US to Fitzpatrick pursuant to the July 7, 2000 agreement
     to purchase 90 common shares of Parctech. (Pls.' Ex. 3;
     Def.'s Ex. D.)

38.  On July 24, 2000, CNB Capital made a payment of $100,000
     US to Fitzpatrick pursuant to the July 7, 2000 agreement
     to purchase 90 common shares of Parctech. (Def.'s Ex.
     D.)

39.  On July 27, 2000, CNB Capital made a payment of
     $100,000.00 US to Fitzpatrick pursuant to the July 7,
     2000 agreement to purchase 90 common shares of Parctech.
     (Def.'s Ex. D.)

40.  On August 2, 2000, CNB Capital made a final payment of
     $78,852.74 US to Fitzpatrick pursuant to the July 7,
     2000 agreement to purchase 90 common shares of Parctech.
     (Def.'s Ex. D.)

41.  The total amount of the five payments made by CNB
     Capital to Fitzpatrick pursuant to the July 7, 2000
     agreement to purchase 90 common shares of Parctech was
     $292,852.74, which should have been sufficient to
     purchase the shares.

42.  On September 1, 2000, Maurice Forget, Fitzpatrick's
     attorney, sent proposed documentation for the sale of
     the Parctech shares to CNB Capital.  Hallé did not take

8

action on the documentation at that time. (Def.'s Ex. K-2.)

43. No document exists that names Film Realty as the owner of either shares of Parctech or of the parcel of land in Montréal that was owned by Parctech in July 2000.

44. Hallé, acting as manager of Film Realty, engaged architects, engineers, and public relations consultants on behalf of Film Realty. (Def.'s Ex. K-5.)

45. Hallé made payments from Film Realty resources and CNB Capital resources to pay these professionals and to pay other expenses. (Testimony of John Hallé.)

46. In January 2001, Hallé discussed Film Realty with Binns, Davimos, and Zalk in New York. During that discussion Hallé informed Binns, Davimos, and Zalk that Film Realty lacked sufficient assets to develop the film studio as planned and owed money to various entities.

47. Binns, who asserted that he was under the impression that considerably more funds had been invested in Film Realty, asked for a refund of his investment.

48. Hallé informed Binns that, under the terms of the PPM, he could not obtain a refund of his investment unless another investor were located to take his place.

49. Following the January 2001 discussion, no further investments were made in Film Realty.

50.  In April 2001, Hallé sold CNBE to Premier Entertainment
     Group, Inc. ("Premier EG").

51.  Hallé represented to Premier EG that CNBE's management
     contract with Film Realty was a non-balance sheet asset
     of CNBE.  (Def.'s Ex. K-21.)  Film Realty was not sold
     to Premier EG.

52.  Davimos went to a meeting where Hallé and
     representatives of Premier EG were discussing the
     acquisition of CNBE by Premier EG and unsuccessfully
     attempted to prevent the transaction from taking place.

53.  As part of the sale of CNBE to Premier EG, Hallé was to
     receive a promissory note for $250,000, 10% of Premier
     EG's stock, 25% percent of the profits from Premier EG
     divisions thereafter run by Hallé, and two lines of
     credit.  Hallé did not receive all of this
     consideration.

54.  On or about May 28, 2001, Fitzpatrick wrote to Hallé,
     seeking to finalize the transaction between CNB Capital
     and Fitzpatrick for the transfer of the Parctech shares.
     (Def.'s Ex. K-24.)

55.  On or about June 14, 2001, Hallé signed and sumbmitted
     to Fitzpatrick an "Agreement Among Shareholders"
     relating to the purchase of the Parctech shares.
     (Def.'s Ex. K-25.)

56.   Hallé signed this agreement on behalf of CNB Capital,
      Inc., which was designated as the "Managing Member of
      Film Realty, LLC." (Id.)

57.   There is no evidence that Fitzpatrick executed this
      "Agreement Among Shareholders."

58.   After about the summer of 2001, no additional progress
      was made toward development of the film studio on the
      Parctech land.

59.   Premier Sports Media and Entertainment Group, Inc., the
      owner of 100% of the shares of Premier EG, was acquired
      in December 2001 by Jaguar Investments, Inc. ("Jaguar").

60.   Hallé's ownership interest in Premier EG was, at the
      time of this transaction, converted to an ownership
      interest in Jaguar.

61.   In a Form 8-K filed with the United States Securities
      and Exchange Commission in January 2002, Jaguar
      represented that Premier EG, upon acquiring CNBE,
      adopted CNBE's name.  (Pls.' Ex. 12 at 5.)

62.   In the same Form 8-K, Jaguar represented that CNBE,
      "through a wholly owned subsidiary, Film Realty Funding
      Company, LLC ('Film Realty'), has acquired approximately
      210,000 square feet of property in Montreal (with an
      option to purchase another 200,00 [sic] square feet),
      upon which CNBE plans to build a film production studio.

Film Realty acquired this property through the purchase of 90% of the outstanding common stock (with an option to purchase the additional 10%) of Partek, Inc. [sic], a Canadian corporation, which owned the property." (Pls.' Ex. 12 at 8.) Hallé denied that he was responsible for this statement and it is contrary to the evidence that what CNBE possessed was a management contract for Film Realty, not the company itself or the land in Montréal. The statement does reflect, however, that it was Film Realty that owned 90% of the outstanding stock of Parctech.

63. Hallé sold his ownership interest in Jaguar for $40,000 in 2004. (Hallé testimony.)


## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction based on diversity of citizenship. See 28 U.S.C. § 1332(a).

2. All claims against defendants other than John Hallé were dismissed with prejudice on the consent of all parties.

3. All claims against Hallé other than for breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of fiduciary duty, conversion, rescission, unjust enrichment, constructive trust, and

punitive damages were also dismissed with prejudice on the consent of all parties.

4. The parties agree that, with the exception of the breach of fiduciary duty claim, all claims are governed by New York law, and the Court can accept that agreement. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 239 n.4 (2d Cir. 1999); Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.3d 239, 242 (2d Cir. 1989).

5. Under New York law, "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage."  2 New York Pattern Jury Instructions (2006), § 4:1 at 594; see also Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).

6. The plaintiffs' claim against Hallé for breach of contract fails to satisfy the first element because there is no evidence of a contract between the plaintiffs and Hallé in his individual capacity.

7. While the evidence establishes that each of the plaintiffs signed the Subscription Agreement, that agreement plainly states that it is "made by and among

Film Realty Funding Company, LLC...and the undersigned

prospective purchaser." (Subscription Agreement at 1.)

8. The evidence also establishes that CNBE had a contract

with Film Realty to manage Film Realty. This contract

is also not a contract between the plaintiffs and Hallé.

Moreover, in the absence of any evidence that Hallé

intended to bind himself personally, or that Hallé is

the alter ego of CNBE, there is no basis for holding

Hallé personally liable for the breach of any contract

entered into by CNBE. See <u>Maragna v. McDonald & T.</u>

<u>Corp.</u>, 777 N.Y.S.2d 732, 733 (Sup. Ct. N.Y. County

2004).

9. Because there was no contract between Hallé and the

plaintiffs, the plaintiffs' claim for a breach of the

covenant of good faith and fair dealing also fails.

Under New York law, a covenant of good faith and fair

dealing is implied in every contract. See <u>Dalton v.</u>

<u>Educ. Testing Serv.</u>, 663 N.E.2d 289, 291 (N.Y. 1995).

Breach of such an implied covenant is not, however, an

independent basis for a cause of action; there can be no

liability for breach of the covenant of good faith and

fair dealing where no valid and binding contract exists

between the plaintiffs and the defendant. See <u>American-</u>

European Art Assoc., Inc. v. Trend Galleries, Inc., 641
N.Y.S.2d 835, 836 (App. Div. 1996).

10. The Court will therefore enter judgment for the
defendant on the plaintiffs' breach of contract and
breach of the covenant of good faith and fair dealing
claims.

11. "Under New York law, the five elements of a fraud claim
must be shown by clear and convincing evidence: (1) a
material misrepresentation or omission of fact (2) made
by defendant with knowledge of its falsity (3) and
intent to defraud; (4) reasonable reliance on the part
of the plaintiff; and (5) resulting damage to the
plaintiff." Crigger v. Fahnestock & Co., Inc., 443 F.3d
230, 233 (2d Cir. 2006); see also 2 New York Pattern
Jury Instructions (2006), § 3:20 at 150.

12. Davimos's and Zalk's claims for fraud fail because they
have failed to establish all the elements of a fraud
claim by clear and convincing evidence.  They have
failed to present any specific material
misrepresentations or omissions of fact that Hallé made
to them and thus it could not be found that any such
statements or omissions were made knowingly and
intentionally.  Moreover, they have failed completely to
show any reasonable reliance on any statements by Hallé.

Indeed, Zalk testified affirmatively that he relied on his general trust in Hallé, and nothing else, in deciding to invest in Film Realty.

13. Binns's claim for fraud fails because he failed to present credible evidence that he relied on any material misrepresentations or omissions by Hallé. While he testified that Hallé told him he was the last investor, that testimony was not credible in view of, among other reasons, its absence from Binns's Complaint. Binns's claim that the defendant represented that Film Realty already owned the Parctech land is also not credible. It conflicts with the statement in the Complaint describing Hallé's alleged representation. Binns's testimony that Hallé represented that Film Realty already existed is not credible in view of, among other things, the fact that the investment check was made payable to CNB Capital. Moreover, there is no credible evidence that Hallé knowingly misrepresented the status of the acquisition of the land in Montréal. The PPM plainly stated that the proceeds of the private placement were to be used to acquire the shares of Parctech and that the acquisition would include the land in Montréal. Moreover, Binns did not present evidence that he reasonably relied on a representation by Hallé

16

that the land was both owned and fully paid for by Film
Realty.  To the contrary, the plaintiffs' proposed
findings of fact, dated three days before the trial in
this case, include a request that the Court find that
"Hallé represented to Plaintiffs' [sic] that Film Realty
existed and would use their investments to purchase 100%
of the stock of Parctech."  (Pls.' Proposed Findings of
Fact, ¶ 5.)  Furthermore, any reliance on the alleged
misrepresentation would not have been reasonable in view
of the contrary statements in the PPM, which Binns
represented in the Subscription Agreement that he had
read.  See Jackson v. Broadcast Music, Inc., No. 04 Civ.
5948, 2006 WL 250524, at *9 (S.D.N.Y. Feb. 1, 2006)
(reliance upon a representation is not reasonable under
New York law "where a party has the means to discover
the true nature of the transaction by the exercise of
ordinary intelligence, and fails to make use of those
means"); Washington Capital Ventures, LLC v.
Dynamicsoft, Inc., 373 F. Supp. 2d 360, 366 (S.D.N.Y.
2005) (a party cannot establish reasonable reliance
under New York law where the representations upon which
the party claims to rely were contradicted by a written
document that party failed to read).  Binns therefore
did not show by clear and convincing evidence that Hallé

17

made any representations relating to ownership of the land that Hallé knew to be false and Binns also failed to show any reasonable reliance.

14. The Court will therefore enter judgment for the defendant on the plaintiffs' fraud claims.

15. The plaintiffs' claims for rescission, which are dependent upon their claims for fraud, fail for the same reasons. Under New York law, "[t]he elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." Allen v. Westpoint-Pepperell, Inc., 945 F.3d 40, 44 (2d Cir. 1991); see also Haggerty v. United Mining Corp., No. 84 Civ. 7671, 1992 WL 230128, at *7 (S.D.N.Y. Aug. 31, 1992); aff'd sub nom. Haggerty v. Comstock Gold Co., 7 F.3d 220 (tbl.) (2d Cir. 1993); Perez v. Hempstead Motor Sales, 662 N.Y.S.2d 184, 188 (Dist. Ct. 1997), aff'd, 674 N.Y.S.2d 564 (App. Term 1998). The plaintiffs have failed to establish these elements. The Court will therefore enter judgment for the defendant on the plaintiffs' rescission claims.

16. The plaintiffs have asserted, and Hallé has not disputed, that the plaintiffs' claims for breach of

fiduciary duty are governed by the law of Delaware, the
state in which Film Realty was incorporated.  The
elements of a breach of fiduciary claim under Delaware
law are the existence of a fiduciary duty and breach of
that duty by a fiduciary.  See York Linings v. Roach,
No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. Jul. 28,
1999); Freibott v. Patterson Schwarz & Assoc., No. Civ.
A 1998-06-319, 2001 WL 1555330, at *3 (Del. Comm. Pl.
Mar. 1, 2001).

17.  The plaintiffs have failed to establish that a fiduciary
relationship existed between Hallé and themselves under
Delaware law.  All of the plaintiffs are sophisticated
investors; this is not a case where there is "confidence
reposed by one side and domination and influence
exercised by the other." Prestancia Mgm't Group, Inc. v.
Va. Heritage Fdn. II, LLC, No. Civ.A. 1032-S, 2005 WL
1364616, at *6 (Del. Ch. May 27, 2005) (internal
quotation marks and citation omitted).  Moreover, the
relationship between the plaintiffs and Film Realty was
governed by the Subscription Agreement and the PPM.  See
id.  The Court will therefore enter judgment for the
defendant on the plaintiffs' breach of fiduciary duty
claims.

19

18.  The plaintiffs' claims for conversion are governed by
     New York Law.  Under New York law, "denial or violation
     of the plaintiff's dominion, rights, or possession, is
     the basis of an action for conversion."  In re
     Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993)
     (quoting Sporn v. MCA Records, Inc., 448 N.E.2d 1324,
     1326 (N.Y. 1983)).  A conversion "implies a wrongful
     act, a misdelivery, a wrongful disposition, or
     withholding of the property."  Id. (internal citation
     and quotation marks omitted).

19.  Conversion may involve money where it is a specifically
     identifiable sum and there is an obligation to treat
     that sum in a particular manner.  See LoPresti v.
     Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997); see also
     Phansalkar v. Anderson Weinroth & Co., 175 F. Supp. 2d
     635, 639-40 (S.D.N.Y. 2001); High View Fund, L.P. v.
     Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998).

20.  The evidence establishes that the plaintiffs willingly
     wired their funds to CNB Capital, and thus that
     possession of their funds by CNB Capital was lawful.
     Davimos's and Zalk's claims for conversion therefore
     fail because there was no evidence presented of a
     specific request for the return of their funds.  There
     is generally no liability for conversion where original

possession is lawful until the true owner demands a return of the property. <u>Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.</u>, 87 F.3d 44, 49 (2d Cir. 1996).

21. The evidence also establishes that the plaintiffs wired their funds to CNB Capital for the purpose of purchasing the Parctech shares from Fitzpatrick (and other expenses of Film Realty), and that the funds were used for that purpose. Because the plaintiffs have not shown that their funds were used for any purpose other than the intended purpose, there is no basis for concluding that Hallé failed to comply with an "obligation to treat [the plaintiffs' funds] in a particular manner." <u>LoPresti</u>, 126 F.3d at 41; <u>cf.</u> <u>Key Bank of N.Y. v. Grossi</u>, 642 N.Y.S.2d 403, 405 (App. Div. 1996). The Court will therefore enter judgment for the defendant on the plaintiffs' conversion claims.

22. The plaintiffs' unjust enrichment claims are also governed by New York law. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." <u>Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>, 448

F.3d 573, 586 (2d Cir. 2006) (internal quotation marks
omitted).

23. These claims fail because the plaintiffs have failed to
establish that Hallé personally benefited at their
expense.  The Court will therefore enter judgment for
the defendant on the plaintiffs' unjust enrichment
claims.

24. Under New York law, there are "four elements for a
constructive trust: '(1) a confidential or fiduciary
relationship; (2) a promise, express or implied; (3) a
transfer of the subject res made in reliance on that
promise; and (4) unjust enrichment.'"  In re First Cent.
Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004) (quoting
United States v. Coluccio, 51 F.3d 337, 340 (2d Cir.
1995)).  "The fourth element is the most important since
'the purpose of the constructive trust is prevention of
unjust enrichment.'"  Id. (quoting Simonds v. Simonds,
380 N.E.2d 189, 194 (N.Y. 1978)).

25. The plaintiffs' claim for constructive trust fails
because they have not established that Hallé was
personally enriched at their expense.  They have also
failed to establish that they had a confidential or
fiduciary relationship with Hallé or that the funds were
used other than for their intended purpose.

26.  The plaintiffs also seek punitive damages.  Under New York law, "a demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action...." Rocanova v. Equitable Life Assur. Soc. of the U.S., 634 N.E.2d 940, 945-46 (N.Y. 1994).  Because the Court finds that Hallé is not liable to the plaintiffs on any substantive causes of action, there is no basis for an award of punitive damages and the plaintiffs' request is denied.

### CONCLUSION

The Clerk is directed to enter judgment dismissing the complaints in these actions and closing the cases.

**SO ORDERED.**

**Dated:    New York, New York**
**          July 10, 2006**

**John G. Koeltl**
**United States District Judge**

23

26.   The plaintiffs also seek punitive damages.  Under New
York law, "a demand or request for punitive damages is
parasitic and possesses no viability absent its
attachment to a substantive cause of action...."
Rocanova v. Equitable Life Assur. Soc. of the U.S., 634
N.E.2d 940, 945-46 (N.Y. 1994).  Because the Court finds
that Hallé is not liable to the plaintiffs on any
substantive causes of action, there is no basis for an
award of punitive damages and the plaintiffs' request is
denied.

## CONCLUSION

The Clerk is directed to enter judgment dismissing the
complaints in these actions and closing the cases.

**SO ORDERED.**

**Dated:**    **New York, New York**
          **July 10, 2006**

                                    _John G. Koeltl_
                              United States District Judge

23